IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

| | | |
|---|---|---|
| DIANNE CURRIN, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 3:14cv141 (JAG) |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
| Defendant. | ) | |
| | ) | |

<u>REPORT AND RECOMMENDATION</u>

Dianne Currin ("Plaintiff") is fifty-five years old and previously worked as a food service worker, house painter, sales attendant and cashier. On April 19, 2011, Plaintiff filed for disability insurance benefits ("DIB"), alleging disability from arthritis, chronic obstructive pulmonary disease ("COPD"), depression, high blood pressure and stroke, with an alleged onset date of April 1, 2007. Plaintiff's application was denied both initially and upon reconsideration. On April 24, 2013, an Administrative Law Judge ("ALJ") held a hearing during which Plaintiff, represented by counsel, and a vocational expert ("VE") testified. On May 3, 2013, the ALJ issued a written opinion, finding that Plaintiff was not disabled under the Social Security Act ("Act"). On January 24, 2014, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner.

Plaintiff seeks judicial review of the ALJ's opinion in this Court pursuant to 42 U.S.C. § 405(g), arguing that substantial evidence does not support the ALJ's residual functional capacity ("RFC") assessment and that, as a result, the ALJ erred in the hypothetical that he provided to the VE. The parties have submitted cross-motions for summary judgment that are

now ripe for review.  Having reviewed the parties' submissions and the entire record in this case,[1] the Court is now prepared to issue a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  For the reasons that follow, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 14) and Motion for Remand (ECF No. 15) be DENIED, that Defendant's Motion for Summary Judgment (ECF No. 17) be GRANTED, and that the final decision of the Commissioner be AFFIRMED.

## I. BACKGROUND

Because Plaintiff challenges the ALJ's decision, Plaintiff's education and work history, Plaintiff's medical history, Plaintiff's function report, third-party function report, Plaintiff's testimony and VE testimony are summarized below.

### A.    Plaintiff's Education and Work History

Plaintiff was forty-seven years old on the alleged onset date.  (R. at 34.)  Plaintiff did not finish high school, but obtained a GED.  (R. at 470-71.)  In the past, Plaintiff worked as a cashier, hospital nutrition specialist, retail stock associate and house painter.  (R. at 183, 471.)

### B.    Plaintiff's Medical History

#### 1. Physical Treatment

On April 3, 2007, Plaintiff went to Community Memorial Healthcenter ("CMH") in South Hill, Virginia, complaining of shortness of breath, but doctors found that her lungs were clear bilaterally and that she had normal pulmonary vascularity.  (R. at 232.)  On October 12, 2007, Plaintiff complained of pain in her right wrist.  (R. at 239.)  Nripendra Devanath, M.D.

---

[1]    The administrative record in this case has been filed under seal, pursuant to E.D. Va. Loc. R. 5 and 7(C). In accordance with these Rules, the Court will endeavor to exclude any personal identifiers such as Plaintiff's social security number, the names of any minor children, dates of birth (except for year of birth), and any financial account numbers, from its consideration of Plaintiff's arguments and will further restrict its discussion of Plaintiff's medical information to only the extent necessary to properly analyze the case.

found minimal degenerative joint disease at the first carpometacarpal joint in her right wrist. (R. at 239.) Dr. Devanath also noted that Plaintiff had minimal degenerative joint disease at the lateral intercarpal joint in her right wrist. (R. at 239.)

On May 23, 2008, Plaintiff visited Chris Burling, M.D. at the Mount Pleasant Family Practice in Mt. Pleasant, Texas, complaining of having trouble breathing. (R. at 275-77.) Plaintiff reported smoking half of a pack of cigarettes per day, and Dr. Burling recommended that she cease smoking. (R. at 275-77.) Dr. Burling's physical examination revealed that Plaintiff had decreased breathing sounds and expiratory wheezing. (R. at 277.) Dr. Burling diagnosed Plaintiff with acute exacerbation of COPD. (R. at 277.) Dr. Burling further treated Plaintiff's COPD with antibiotics and breathing treatments. (R. at 318-19.)

On August 14, 2008, Plaintiff visited East Texas Orthopaedics with pain in her right knee. (R. at 359.) David A. Hester, M.D. found significant right knee arthritis, ordered that Plaintiff receive Depo-Medrol injections and schedule physical therapy treatments. (R. at 359, 363.)

On October 15, 2008, Plaintiff visited Azalea Orthopedics, reporting right knee pain and swelling. (R. at 362.) Doctors determined that her degenerative joint disease may have caused the pain and swelling, but were also concerned that she might have an associated meniscal tear. (R. at 362.) On December 4, 2008, Plaintiff had an MRI of her right knee that revealed a small joint effusion, small cyst and a degenerative change in the posterior horn of the medial meniscus. (R. at 366.) However, no evidence of a tear in the cruciate or collateral ligaments existed. (R. at 366.)

On May 12, 2009, Plaintiff checked into the Titus Regional Medical Center in Mt. Pleasant, Texas, reporting a sudden onset of dizziness and lightheadedness while bending over at

3

work. (R. at 299.) Plaintiff presented with elevated blood pressure and a possible head infarction. (R. at 299.) She reported experiencing slurred speech the previous Friday and Saturday, but it had resolved, and her lightheadedness was moderate and had improved. (R. at 299.) Plaintiff's brain scan revealed no evidence of intracranial hemorrhage, but doctors recommended that Plaintiff undergo an MRI. (R. at 307.) Her hypertension improved slightly during her time in the hospital, and Plaintiff admitted to doctors that she had not previously been following her home medication regimen. (R. at 304.)

On November 19, 2010, Plaintiff visited Richard Batz, M.D. for an x-ray of her right knee. (R. at 215.) Dr. Batz found that Plaintiff had no fracture or dislocation, but did have mild to moderate osteoarthritic changes. (R. at 215.)

On May 26, 2011, Plaintiff visited CMH for a refill of medication. (R. at 217.) Doctors recorded that Plaintiff suffered from lumbar-sacral disc degeneration. (R. at 218.) A chest x-ray showed that Plaintiff's lungs were free of any cardiopulmonary process. (R. at 221.) During Plaintiff's September 12, 2011 mental status examination with James O'Keefe, Psy.D., Plaintiff reported discomfort in her neck and extremities, had to switch chairs multiple times during the examination and stated that "mainly [her] body" kept her from working. (R. at 248.)

In early 2012, Plaintiff visited Earle Moore, M.D. at Chase City Family Practice ("CCFP") multiple times, often complaining of neck and back pain. (R. at 345-46, 348-49.) Dr. Moore treated Plaintiff for chronic back pain that she claimed kept her from being able to work. (R. at 348.) Dr. Moore found that Plaintiff had no neck tenderness or stiffness and had normal range of motion. (R. at 349.) Plaintiff reported no back stiffness or spine tenderness. (R. at 349.) Dr. Moore diagnosed Plaintiff with lumbar spine tenderness, but found that Plaintiff retained a normal range of motion. (R. at 349.) Dr. Moore also treated Plaintiff for her

hypertension and COPD on several occasions. (R. at 342, 346.) On January 20, 2012, Dr.

Moore found no respiratory problems or wheezing. (R. at 346.)

      2. Mental Treatment

      On September 14, 2005, Plaintiff went to CMH after a reported drug overdose, describing

her home stressors as "unbearable." (R. at 227.) Doctors diagnosed Plaintiff with depression

with suicidal ideation. (R. at 231.) On April 29, 2008, Plaintiff visited Dr. Burling, complaining

of insomnia. (R. at 279.) Plaintiff discussed her history of depression, but stated that she took

no medications. (R. at 279.) Dr. Burling put Plaintiff on a trial of Remeron to treat her chronic

insomnia. (R. at 281.)

      On May 23, 2008, Plaintiff returned to Dr. Burling, reporting light-headedness and

shortness of breath related to her anxiety and depression. (R. at 275.) Dr. Burling opined that

true panic attacks did not occur. (R. at 275.) Plaintiff reported taking Celexa, but it did not

improve her condition. (R. at 275.) Dr. Burling noted that Plaintiff was alert and oriented, with

an appropriate affect and demeanor. (R. at 277.)

      On November 6, 2010, Plaintiff saw Julian I. Osuji, Ph.D. for depression and anxiety.

(R. at 210-11.) Nothing made Plaintiff happy, and she spent her days searching for employment.

(R. at 211.) Further, Plaintiff reported that daily activities, such as cooking and cleaning, were

difficult and required her to take frequent breaks. (R. at 211.) Plaintiff also admitted that she

took her brother's prescription Vicodin for her back pain. (R. at 212.) Dr. Osuji determined that

Plaintiff's psychiatric symptoms were "somewhat impairing" and recommended psychotherapy

for Plaintiff to learn adaptive coping skills for her depression and chronic pain. (R. at 214.)

      On September 16, 2011, Plaintiff underwent a psychiatric examination with Dr. O'Keefe,

during which she complained of depression. (R. at 35, 248.) She rated her depression as an

eight on a one-to-ten scale, with ten being the highest level of depression. (R. at 250.) Plaintiff reported difficulty sleeping and described a major breakdown that occurred shortly after she returned to Virginia from caring for her ailing father in Texas. (R. at 250.) Plaintiff stated that she had neither energy, nor motivation to do anything. (R. at 250.) Plaintiff slept for much of the day. (R. at 250.) Plaintiff also used to be a people person but was not anymore, and most of her previous jobs did not involve substantial public interaction. (R. at 36, 250.) She reported frequent thoughts of suicide, but did not express a desire to harm herself. (R. at 250.) Dr. O'Keefe determined that Plaintiff had no psychotic symptoms and that much of her depression was secondary to her medical problems, specifically high blood pressure and arthritis, as well as her changing life circumstances, such as her separation from her husband. (R. at 251.) Dr. O'Keefe determined that Plaintiff's symptoms were likely to remit with consistent prescription treatment and counseling. (R. at 251.) Dr. O'Keefe concluded that regular work attendance and performance depended mostly on whether Plaintiff had the energy and motivation to complete assignments. (R. at 35, 252.) He opined that Plaintiff could accomplish her work activities if she had the energy and motivation to follow through. (R. at 35-36.)

On January 3, 2012, Plaintiff visited Dr. Moore at CCFP for continuing treatment of her hypertension and COPD. (R. at 342-44.) At this time, Dr. Moore noted that Plaintiff had normal memory function and her insight was not impaired. (R. at 342.) Plaintiff's depression was chronic, but controlled. (R. at 343.) On January 20, 2012, Plaintiff complained of back and neck pain, but said that she had not felt "down, depressed or hopeless" over the previous two weeks. (R. at 345.) On March 12, 2012, Dr. Moore again diagnosed normal mental function and determined that Plaintiff had sound insight and judgment. (R. at 349.)

On March 19, 2013, Plaintiff visited the Southside Community Services Board in South Hill, Virginia. (R. at 460-61.) She represented that she had trouble dealing with mental issues and was "happy one minute and angry/sad the next minute." (R. at 461.) Raven Jackson, an employee of the Board, reported that Plaintiff had an anxious demeanor and exhibited sadness, fatigue, loss of interest, guilt and feelings of worthlessness. (R. at 463.) Doctors also confirmed that Plaintiff met the requirements for serious mental illness. (R. at 464.)

C.      State Agency Physicians

On October 4, 2011, state examiner James Darden, M.D. determined that Plaintiff maintained the RFC to perform light work and to lift or carry twenty pounds occasionally and ten pounds frequently. (R. at 40-42, 57.) Plaintiff could stand or walk for a total of six hours in an eight-hour workday, and she could sit for about six hours in an eight-hour workday. (R. at 40-41.) Further, Dr. Darden found that Plaintiff could frequently climb ramps and stairs, occasionally climb ladders, ropes and scaffold, and occasionally stoop. (R. at 41.) Plaintiff could perform a wide range of light work. (R. at 41.) On November 15, 2011, Ralph Hellams, M.D. confirmed this analysis. (R. at 57.)

On October 5, 2011, state agency psychological consultant Leslie Montgomery, Ph.D. reviewed Plaintiff's case and found that she was moderately limited in her ability to understand and remember detailed instructions. (R. at 42-44.) Further, Plaintiff was moderately limited in her ability to work with others without distraction. (R. at 42.) Dr. Montgomery concluded that Plaintiff was moderately limited in her ability to perform a normal workday. (R. at 43.) Finally, examiners found that Plaintiff had moderate limitations in interaction with the public and getting along with her peers without distraction. (R. at 43.)

7

D.   Plaintiff's Function Report

On July 29, 2011, Plaintiff completed a Function Report. (R. at 172-80.) She reported that typically she fixed simple breakfasts, sat around for most of the day, napped, tried to sweep the floors for an hour, made a light supper and watched television until bed. (R. at 173.) Plaintiff could not sweep, mop, make her bed, clean her bathroom or vacuum her car after the onset of her illnesses. (R. at 174.) Plaintiff indicated that without medication, her restless leg syndrome kept her up at night. (R. at 174.) Plaintiff needed to be awakened sometimes when she slept, because she stopped breathing. (R. at 174.) Plaintiff reported difficulty lifting her legs to put on pants or reaching behind her back. (R. at 174.) Plaintiff had no problem feeding herself or using the toilet. (R. at 174.) She further needed no reminders to take care of her personal needs or grooming. (R. at 175.) She sometimes needed reminders to take her medication. (R. at 175.)

She prepared food weekly or biweekly, usually sandwiches or frozen dinners, and she could not prepare full meals because of pain. (R. at 175.) Plaintiff could complete small loads of laundry, but little other housework. (R. at 175.) Plaintiff could drive a car and go out alone. (R. at 176.) She shopped in stores. (R. at 176.) Plaintiff reported that she could pay bills, handle a savings account, count change and use a checkbook/money order. (R. at 176.) Her ability to handle money had not changed since the onset of her condition. (R. at 177.)

Plaintiff reported socializing with others about twice per week at home. (R. at 177.) Plaintiff needed no reminders to go places. (R. at 177.) She additionally went out about three times each week and did not need anyone to accompany her. (R. at 177.) Plaintiff reported that she had problems getting along with others, because she was moody. (R. at 178.)

8

Plaintiff reported that her conditions affected her memory, understanding, following instructions, getting along with others, concentration and ability to complete tasks. (R. at 178.) She could pay attention for a few hours, but sometimes forgot steps in written instructions and had trouble remembering certain things. (R. at 178.) She sometimes could finish what she started. (R. at 178.)

Plaintiff got along with authority figures fairly well. (R. at 179.) She had never been fired or laid off from a job because of problems getting along with others. (R. at 179.) Plaintiff handled changes in routine sufficiently. (R. at 179.) She did, however, breakdown because of stress. (R. at 179.) Plaintiff indicated that she feared that there was not enough income. (R. at 179.)

E. Third Party Report

On July 29, 2011, Plaintiff's husband also completed a Function Report. (R. at 162-72.) He indicated that Plaintiff performed light housework, including cleaning, laundry and preparing light meals. (R. at 163, 165.) Plaintiff's husband reported that these chores took about four to five hours once each week and that he helped Plaintiff with those chores. (R. at 166.) Plaintiff could neither work nor sleep, because she could not breathe. (R. at 164.) Plaintiff's husband reminded Plaintiff to take her medication. (R. at 165.) He further stated that Plaintiff drove about once per day, and shopped for groceries about once per week. (R. at 166-67.)

Plaintiff could pay bills, count change, handle a savings account and use her checkbook. (R. at 167.) Mr. Currin reported that Plaintiff read and watched television for leisure often, and that there had been no changes in these activities since her conditions began. (R. at 167.) Plaintiff talked with others about once a week, but her moodiness kept her from getting along with others. (R. at 168.) Plaintiff's husband reported that Plaintiff could walk about 200 feet

before needing to rest for three to five minutes, did not finish what she started, could somewhat follow oral and written instructions, got along with authority figures and had never been fired or laid off for problems working with others. (R. at 169.) Plaintiff did not handle stress well, handled changes in routine somewhat better and was often irritated or depressed. (R. at 170.)

F.   Plaintiff's Testimony

On April 24, 2013, Plaintiff, represented by counsel, appeared before an ALJ. (R. at 469-77.) Plaintiff testified that her COPD caused her to breathe heavily and kept her from climbing stairs or walking more than fifteen to twenty feet before being out of breath. (R. at 470, 472.) She further admitted that she sometimes used her husband's nebulizer. (R. at 473.) Plaintiff reported that arthritis in her knees and shoulders only allowed her to lift about five pounds. (R. at 473.) Plaintiff stated that she could not deal with large crowds. (R. at 474.) She further testified to having a job at a donut shop that lasted for only a few days because of her depression and lack of desire to get out of bed. (R. at 475.) Plaintiff reported lack of interest in activities in which she formerly took pleasure, but stated that she was receiving treatment for her anxiety and depression at CCFP. (R. at 476.)

G.   VE Testimony

A VE also testified before the ALJ on April 24, 2013. (R. at 477-80.) The ALJ asked the VE hypothetically whether an individual of Plaintiff's same age, education and work history with certain limitations could perform Plaintiff's past relevant work or jobs existing in the national and local economies. (R. at 478.) Specifically, the ALJ asked the VE to assume the following limitations: occasionally lift and carry twenty pounds, frequently lift and carry ten pounds, stand or walk with normal breaks for six hours in an eight-hour workday, sit with normal breaks for eight hours in an eight-hour workday, occasionally climb ladders, ropes and scaffolds,

10

occasionally stoop and frequently climb ramps and stairs. (R. at 478.) The ALJ also asked the VE to assume that the individual had an unlimited ability to balance, kneel and crouch. (R. at 478.) The ALJ asked the VE to assume that the individual had additional mental impairments, but that individual retained the ability to perform simple, unskilled work tasks on a sustained basis in a competitive work environment, with little to no interaction with co-workers and the public. (R. at 478.) The VE testified that assuming all of those things, that individual could not perform Plaintiff's past work. (R. at 478.) The VE did testify, however, that the individual could perform work as a cleaner, with over 377,000 positions nationally and 11,000 positions in Virginia, and as a packer, with over 320,000 positions nationally and 7,700 positions in Virginia. (R. at 478-79.)

## II. PROCEDURAL HISTORY

On April 19, 2011, Plaintiff filed for SSI stemming from arthritis, COPD, depression, high blood pressure and stroke, with an alleged onset date of April 1, 2007. (R. at 49.) Her application was denied both initially and upon reconsideration. (R. at 48-68.) On April 24, 2013, an ALJ held a hearing during which Plaintiff, represented by counsel, and a VE testified. (R. at 467-80.) On May 3, 2013, the ALJ issued a written opinion finding that Plaintiff was not disabled under the Act. (R. at 18-33). The Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner. (R. at 6-10.)

## III. QUESTIONS PRESENTED

1.      Did the ALJ err in determining Plaintiff's RFC?

2.      Did the ALJ err in posing the hypothetical to the VE?

11

## IV.  STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, the Court is limited to determining whether substantial evidence in the record supports the Commissioner's decision and whether the proper legal standards were applied in evaluating the evidence. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (citing *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)).  Substantial evidence is more than a scintilla, is less than a preponderance and is the kind of relevant evidence a reasonable mind could accept as adequate to support a conclusion. *Id.*; *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

To determine whether substantial evidence exists, the Court must examine the record as a whole, but may not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Hancock*, 667 F.3d at 472 (citation and internal quotation marks omitted); *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Craig*, 76 F.3d at 589).  In considering the decision of the Commissioner based on the record as a whole, the Court must "take into account whatever in the record fairly detracts from its weight." *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951)) (internal quotation marks omitted).  The Commissioner's findings as to any fact, if substantial evidence in the record supports the findings, are conclusive and must be affirmed. *Hancock*, 667 F.3d at 476 (citation omitted).  While the standard is high, if substantial evidence in the record does not support the ALJ's determination or if the ALJ has made an error of law, the district court must reverse the decision. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A sequential evaluation of a claimant's work and medical history is required to determine if a claimant is eligible for benefits. 20 C.F.R. §§ 404.1520, 416.920; *Mastro*, 270 F.3d at 177. An ALJ conducts the analysis for the Commissioner, and a court must examine that process on appeal to determine whether the ALJ applied the correct legal standards and whether substantial evidence on the record supports the resulting decision of the Commissioner. *Mastro*, 270 F.3d at 176-77.

The first step in the sequence is to determine whether the claimant was working at the time of the application and, if so, whether the work constituted "substantial gainful activity" ("SGA"). 20 C.F.R. §§ 404.1520(b), 416.920(b). SGA is work that is both substantial and gainful as defined by the Agency in the C.F.R. Substantial work activity is "work activity that involves doing significant physical or mental activities. Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before." 20 C.F.R. § 404.1572(a). Gainful work activity is work activity done for "pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b). Taking care of oneself, performing household tasks or hobbies, therapy or school attendance, and the like are not generally considered substantial gainful activities. 20 C.F.R. § 404.1572(c). If a claimant's work constitutes SGA, the analysis ends and the claimant must be found "not disabled," regardless of any medical condition. *Id.*

If the claimant establishes that she did not engage in SGA, the second step of the analysis requires her to prove that she has "a severe impairment . . . or combination of impairments which significantly limit[s] [her] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c), 416.920(c). To qualify as a severe impairment that entitles one to benefits under

13

the Act, it must cause more than a minimal effect on one's ability to function. 20 C.F.R. § 404.1520(c).

At the third step, if the claimant has an impairment that meets or equals an impairment listed in 20 C.F.R. part 404, subpart P, appendix 1 (listing of impairments) and lasts, or is expected to last, for twelve months or result in death, it constitutes a qualifying impairment and the analysis ends. 20 C.F.R. §§ 404.1520(d), 416.920(d).  If the impairment does not meet or equal a listed impairment, then the evaluation proceeds to the fourth step in which the ALJ must determine whether the claimant can return to her past relevant work[2] based on an assessment of the claimant's RFC[3] and the "physical and mental demands of work [the claimant] has done in the past." 20 C.F.R. §§ 404.1520(e), 416.920(e).  If such work can be performed, then benefits will not be awarded. 20 C.F.R. §§ 404.1520(a)(iv), 416.920(a)(iv).  The burden of proof remains with the claimant through step four of the analysis, such that she must prove that her limitations preclude her from performing her past relevant work. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Hancock*, 667 F.3d at 472.

However, if the claimant cannot perform her past work, the burden then shifts to the Commissioner at the fifth step to show that, considering the claimant's age, education, work experience and RFC, the claimant is capable of performing other work that is available in

---

[2]    Past relevant work is defined as SGA in the past fifteen years that lasted long enough for an individual to learn the basic job functions involved. 20 C.F.R. §§ 404.1565(a), 416.965(a).

[3]    RFC is defined as "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR-96-8p. When assessing the RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (*i.e.*, 8 hours a day, 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. *Id.*

14

significant numbers in the national economy. 20 C.F.R. §§ 416.920(f), 404.1520(f); *Powers v. Apfel*, 207 F.3d 431, 436 (7th Cir. 2000) (citing *Yuckert*, 482 U.S. at 146 n.5). The Commissioner can carry her burden in the final step with the testimony of a VE. When a VE is called to testify, the ALJ's function is to pose hypothetical questions that accurately represent the claimant's RFC based on all evidence on record and a fair description of all of the claimant's impairments, so that the VE can offer testimony about any jobs existing in the national economy that the claimant can perform. *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). Only when the hypothetical posed represents all of the claimant's substantiated impairments will the testimony of the VE be "relevant or helpful." *Id.* If the ALJ finds that the claimant is not capable of SGA, then the claimant is found to be disabled and is accordingly entitled to benefits. 20 C.F.R. §§ 404.1520(f)(1), 416.920(f)(1).

## V. ANALYSIS

A.     The ALJ's Opinion

On April 24, 2013, the ALJ held a hearing during which Plaintiff, represented by counsel, and a VE testified. (R. at 467-80.) On May 3, 2013, the ALJ issued a written opinion, determining that Plaintiff was not disabled under the Act. (R. at 15-17.) The ALJ followed the five-step sequential evaluation process as established by the Act when analyzing whether Plaintiff was disabled. (R. at 18-33.)

At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since April 19, 2011, but that since her alleged onset date on April 1, 2007, she had engaged in substantial gainful activity in 2007, 2008, and in the first quarters of 2011 and 2012. (R. at 20.) At step two, the ALJ determined that Plaintiff suffered severe impairments in the form of degenerative disc disease, degenerative joint disease and major depressive disorder. (R.

at 20-21.)  At step three, the ALJ determined that Plaintiff did not have an impairment or

combination of impairments that met or equaled the severity of one of the listed impairments in

20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. at 22-23.)

The ALJ next determined that Plaintiff maintained the RFC to perform light work, except

that she was limited to lifting or carrying twenty pounds occasionally and ten pounds frequently,

standing or walking and sitting for six hours each in an eight-hour workday, climbing ladders,

ropes, scaffolds or stooping occasionally, and climbing ramps or stairs frequently.  (R. at 24-32.)

The ALJ further determined that Plaintiff had limitations from her mental impairments, but could

still perform simple, unskilled tasks on a sustained basis in a competitive work environment

where Plaintiff rarely had to interact with co-workers and the general public.  (R. at 24-32.)  At

step four, the ALJ found that Plaintiff was unable to perform any of her past relevant work.  (R.

at 32.)  At step five, the ALJ found that there were jobs existing in significant numbers in the

national and local economy that Plaintiff could perform.  (R. at 32-33.)  Therefore, the ALJ

found that Plaintiff was not disabled under the Act.  (R. at 33.)

Plaintiff challenges the ALJ's decision, arguing that the ALJ erred by not incorporating

all of Plaintiff's mental limitations into Plaintiff's RFC and, as a result, erred by failing to

present a proper hypothetical to the VE.  (Mem. in [sic] of P. & A. in Supp. of Pl.'s Mot. for

Summ. J. ("Pl.'s Mem.") (ECF No. 16) at 4-7.)  Defendant responds that substantial evidence

supports the ALJ's decision.  (Def.'s Mot. for Summ. J. and Br. in Supp. Thereof ("Def.'s

Mem.") (ECF No. 17) at 12-15.)

B. The ALJ did not err in determining Plaintiff's RFC.

Plaintiff argues that the ALJ erred by failing to adequately account for all of Plaintiff's

mental limitations in Plaintiff's RFC. (Pl.'s Mem. at 4-6.) Defendant responds that substantial

evidence supports the ALJ's RFC determination. (Def.'s Mem. at 12-14.)

After step three of the analysis, but before deciding whether a claimant can perform past

relevant work at step four, the ALJ must determine the claimant's RFC. 20 C.F.R.

§§ 416.920(e)-(f), 416.945(a)(1). In analyzing a claimant's abilities, an ALJ must first assess the

nature and extent of the claimant's physical and mental limitations and then determine the

claimant's RFC for work activity on a regular and continuing basis. 20 C.F.R. § 404.1545(b).

Generally, the claimant bears the responsibility to provide the evidence that the ALJ utilizes in

making his RFC determination; however, before making a determination that a claimant is not

disabled, the ALJ must develop the claimant's complete medical history, including scheduling

consultative examinations if necessary. 20 C.F.R. § 404.1545(a)(3). The RFC must incorporate

impairments supported by the objective medical evidence in the record and those impairments

that are based on the claimant's credible complaints. 20 C.F.R. § 404.1545(e).

In this case, the ALJ found that Plaintiff maintained the RFC to perform light work,

except that she was limited to lifting or carrying twenty pounds occasionally and ten pounds

frequently, standing or walking and sitting for six hours each in an eight-hour workday, climbing

ladders, ropes, scaffolds or stooping occasionally, and climbing ramps or stairs frequently. (R. at

24.) The ALJ further found that, despite Plaintiff's limitations from her mental impairments, she

could perform simple, unskilled work tasks in a competitive environment where she had little to

no interaction with co-workers and the general public. (R. at 24.) Substantial evidence supports

the ALJ's RFC determination that Plaintiff could perform simple, unskilled work tasks with little to no interaction with co-workers or the general public.[4]

Medical records support the ALJ's determination. On May 23, 2008, Dr. Burling opined that Plaintiff did not have true panic attacks. (R. at 275.) Dr. Burling further noted that Plaintiff appeared alert and oriented, and that Plaintiff showed appropriate affect and demeanor. (R. at 277.) Dr. Osuji determined that Plaintiff's mental symptoms were only somewhat impairing, and he recommended therapy to learn adaptive and coping skills. (R. at 214.)

On September 16, 2011, Dr. O'Keefe opined that Plaintiff had no psychotic symptoms. (R. at 250.) Dr. O'Keefe also determined that Plaintiff's depression was secondary to medical conditions and changing life circumstances, specifically separation from her husband. (R. at 251.) He also believed that Plaintiff's symptoms would remit with consistent treatment and counseling. (R. at 251.) On October 5, 2011, Dr. Montgomery found that Plaintiff experienced only moderate limitations in her ability to understand and remember detailed instructions, as well as her ability to work with others without distraction. (R. at 42-44.) Dr. Montgomery determined that Plaintiff had a moderate ability to perform a normal workday. (R. at 43.)

On January 3, 2012, Dr. Moore noted that Plaintiff had normal memory function and that Plaintiff's insight was not impaired. (R. at 342.) Dr. Moore further noted that Plaintiff's depression was controlled. (R. at 343.) On March 12, 2012, Dr. Moore assessed that Plaintiff maintained sound insight and judgment. (R. at 348-49.)

Plaintiff's own statements further support the ALJ's determination. Plaintiff needed no reminders to take care of her personal needs or her grooming. (R. at 175.) Plaintiff went out alone approximately three times each week and shopped in stores. (R. at 176-77.) She reported

---

[4]     Because Plaintiff only challenges the sufficiency of the RFC's mental limitations, the Court does not address whether substantial evidence supports the RFC's physical limitations.

that her condition did not affect her ability to handle money. (R. at 177.) Plaintiff reported that she could pay bills, handle a savings account, count change and use a checkbook. (R. at 176.) Plaintiff socialized with others about two times each week. (R. at 177.) Additionally, Plaintiff could pay attention for a few hours at a time. (R. at 178.) She got along with authority figures fairly well, and she had never left a job or been fired for failing to get along with others. (R. at 179.) Plaintiff adapted to change in routine sufficiently. (R. at 179.)

Third party evidence also supports the ALJ's determination. Plaintiff's husband reported that Plaintiff drove daily and went shopping for groceries. (R. at 166-67.) Plaintiff's husband noted that Plaintiff could pay bills, count change and handle a savings account. (R. at 167.) Plaintiff read for leisure. (R. at 167.) Plaintiff could somewhat follow both oral and written instructions. (R. at 169.) Finally, Plaintiff's husband reported that Plaintiff got along well with authority figures and she had never been laid off or fired from a job because of problems getting along with others. (R. at 169.) Therefore, substantial evidence supports the ALJ's RFC determination.

C.     The ALJ did not err in his hypothetical to the VE.

Plaintiff argues that the ALJ erred by failing to present a proper hypothetical to the ALJ in determining whether Plaintiff could perform jobs existing in the economy. (Pl.'s Mem. at 4.) Defendant maintains that the ALJ did not err. (Def.'s Mem. at 14.)

At the fifth step of the sequential analysis, the Commissioner must show that, considering the claimant's age, education, work experience and RFC, the claimant is capable of performing other work that is available in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(f), 416.920(f). The Commissioner can carry her burden in the final step with the testimony of a VE. As noted earlier, when a VE is called to testify, the ALJ's function is to pose

hypothetical questions that accurately represent the claimant's RFC based on all evidence on record and a fair description of all of the claimant's impairments, so that the VE can offer testimony about any jobs existing in the national economy that the claimant can perform. *Walker*, 889 F.2d at 50. Only when the hypothetical posed represents all of the claimant's substantiated impairments will the testimony of the VE be "relevant or helpful." *Id.*

The ALJ provided the above-discussed RFC to the VE at the hearing. (R. at 478.) The VE testified that a hypothetical individual with that RFC could perform work as a cleaner, with over 11,000 cleaner jobs in Virginia, or a packer, with over 7,700 positions in Virginia. (R. at 478-79.) Based upon the testimony of the VE, the ALJ determined at step five that Plaintiff was not disabled under the Act. (R. at 33.)

In this case, the ALJ's hypothetical posed to the VE was appropriate, because it properly accounted for Plaintiff's RFC. As noted above, substantial evidence supports the ALJ's RFC determination. Because the hypothetical posed to the VE took into account all of Plaintiff's physical and mental limitations described in the RFC and substantial evidence supports the RFC determination, the ALJ did not err.

## VI. CONCLUSION

Based on the foregoing analysis, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 14) and Motion to Remand (ECF No. 15) be DENIED; that Defendant's Motion for Summary Judgment (ECF No. 17) be GRANTED; and that the final decision of the Commissioner be AFFIRMED.

Let the Clerk file this Report and Recommendation electronically, provide a copy to the

Honorable John A. Gibney, Jr. and notify all counsel accordingly.

## NOTICE TO PARTIES

Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a de novo review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.

/s/

David J. Novak
United States Magistrate Judge

Richmond, Virginia
Date: January 6, 2015

21